IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN O. HAFEN, in his capacity as Court-appointed Receiver,<br><br>Plaintiff,<br><br>v.<br><br>SUSAN FAMULARY, in her capacity as executor of the estate of Fern Oberhansly; JOHN OBERHANSLY, in his individual capacity; MARK OBERHANSLY, in his individual capacity; SALLY BASTIAN, in her individual capacity; and SUSAN FAMULARY, in her individual capacity,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING RECEIVER'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00627-TC<br><br>Judge Tena Campbell |

Before the Court is the Receiver's Motion for Partial Summary Judgment (the "Motion") against the estate of Fern Oberhansly (the "Estate"). See ECF No. 17. Having considered the Parties' submissions, and based on the undisputed material facts, the Receiver is entitled to judgment as a matter of law as set forth below.

**FACTUAL AND PROCEDURAL BACKGROUND**

On November 13, 2018, the Commodity Futures Trading Commission ("CFTC") and the Utah Division of Securities ("UDOS") initiated a civil enforcement action against Rust Rare Coin, Inc. ("RRC"), Gaylen Dean Rust, and affiliated individuals and entities (collectively, the "Receivership Defendants"). Commodity Futures Trading Commission v. Rust Rare Coin, Inc., Civil No. 2:18-cv-00892-TC-DBP, ECF No. 1 (the "Enforcement Action"). The CFTC and UDOS alleged that the Receivership Defendants had offered a silver investment opportunity (the

1

"Silver Pool") through which Receivership Defendants purported to generate returns for investors through the buying and selling of physical silver. The CFTC and UDOS also alleged that—rather than a legitimate investment opportunity—the Silver Pool operated as a Ponzi scheme.

On November 15, 2018, the Court appointed Jonathan O. Hafen (the "Receiver") as Temporary Receiver for the assets of the Receivership Defendants. On November 27, 2018, the Court entered an Order Appointing Receiver and Staying Litigation (the "Appointment Order"), which continued the Receiver's appointment until further order of the Court. The Receiver was charged with, among other things, investigating the financial and business affairs of Receivership Defendants and recovering all assets of the Receivership Estate.

On September 5, 2019, the Receiver commenced the above-captioned ancillary proceeding, seeking to recover funds transferred to Defendants by Receivership Defendants. On September 23, 2020, the Receiver filed the instant Motion, seeking a determination (1) that Receivership Defendants operated the Silver Pool since at least 2008, (2) that the Silver Pool operated not as a legitimate investment opportunity, but was instead a Ponzi scheme, (3) that during her lifetime Fern Oberhansly invested $2,612,939.68 into a Silver Pool account with Receivership Defendants, and (4) that Ms. Oberhansly, and later her Estate, received $16,479,500 in disbursements from the Silver Pool. The Receiver seeks disgorgement back to the Receivership Estate of all amounts received in excess of Ms. Oberhansly's initial principal investment.

In support of the Motion, the Receiver submitted declarations from Mr. Hafen ("Hafen Decl.") and D. Ray Strong ("Strong Decl."), who was retained by the Receiver as an expert consultant and witness. Mr. Hafen's declaration also incorporated and relied upon Mr. Hafen's

Receiver's Report, issued in the Enforcement Action. The Receiver's Report details Mr. Hafen's extensive investigation into the business operations and financial condition of the Receivership Defendants and summarizes the key findings of that investigation. Attached to the Receiver's Report are hundreds of pages of exhibits and voluminous appendices containing the documents on which Mr. Hafen bases his conclusions. Similarly, Mr. Strong's declaration is accompanied by sixty-eight detailed exhibits and comprehensive appendices providing support for Mr. Strong's analysis.

In its response to the Receiver's Motion, the Estate asserted that it was "not aware of any evidence to refute the factual statements" contained in paragraphs 1–22 of the Receiver's Motion. See ECF No. 25 at 4. In addition, the Estate admitted that the factual assertions contained in paragraphs 23–28 of the Motion were "consistent with the Estate's records." Id.

The Court has carefully considered the parties' submissions. The Court finds the declarations of Mr. Hafen and Mr. Strong to be substantial, credible, and persuasively supported by the accompanying documents in the record. The undisputed evidence accompanying the Motion conclusively establishes that Receivership Defendants operated a Ponzi scheme since at least 2008, that Receivership Defendants misrepresented the nature of that scheme in order to defraud investors, that Ms. Oberhansly invested in the scheme, and that Ms. Oberhansly, and later her Estate, received payments from the Ponzi scheme in excess of amounts invested.

## DISCUSSION

The Receiver seeks a determination that the Silver Pool operated as a Ponzi scheme since at least 2008 and that Ms. Oberhansly, and later her Estate, received $13,866,560.32 from the Silver Pool in excess of the amounts invested into the Silver Pool. The Receiver seeks to have that amount disgorged back to the Receivership Estate as a voidable transfer pursuant to Utah's

Uniform Voidable Transactions Act (the "Act").[1] See UTAH CODE § 25-6-101 *et seq*. For the reasons discussed below, the Receiver's Motion is granted in its entirety.

## I. Summary Judgment Standard

Summary judgment is appropriate "when there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law." Lints v. Graco Fluid Handling (A) Inc., 347 F. Supp. 3d 990, 1002 (D. Utah 2018); FED. R. CIV. P. 56(a). In applying this standard, the Court "view[s] the factual record and draw[s] all reasonable inferences therefrom most favorably to the nonmovant." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). Here, the parties do not dispute any material fact. See ECF No. 25 at 4. In the absence of any disputed facts, the Court must nevertheless determine whether the Receiver is entitled to judgment in his favor as a matter of law. See Reed v. Bennett, 312 F.3d 1190, 1195 (10th Cir. 2002) (holding that unopposed motion for summary judgment may only be granted if the court determines that the undisputed facts entitle the moving party to judgment as a matter of law).

## II. Utah's Uniform Voidable Transactions Act in the Context of Ponzi Schemes

Under Utah law, a transfer is voidable under the Act "if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." UTAH CODE § 25-6-202(1)(a). The Act allows a creditor to obtain "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." Id. § 25-6-303(1)(a); see also id. § 25-6-304(2)(a) ("[T]o the extent a transfer is avoidable in an action by a creditor under Subsection 25-6-303(1)(a), . . . the creditor may recover judgment for the value of the asset transferred."). In the context of a Ponzi scheme, this Court has stated that "the mere existence of a Ponzi scheme is

---

[1] The Receiver also asserted a claim for unjust enrichment against the Estate, but did not move for summary judgment as to that claim.

sufficient to establish a defendant's actual intent to defraud." Klein v. Nelson, No. 2:13-cv-497-TC, 2015 WL 4545748, at *2 (D. Utah July 28, 2015); see also Wing v. Dockstader, 482 F. App'x 361, 363 (10th Cir. 2012) (same); In re Indep. Clearing House, 77 B.R. 843, 860 (D. Utah 1987) ("One can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible."). "[A] receiver of an entity which was used to perpetrate a Ponzi scheme has standing to recover fraudulent transfers as though the receiver were a creditor of the scheme." Dockstader, 482 F. App'x at 363, adopting the reasoning of Scholes v. Lehmann, 56 F.3d 750, 753–55 (7th Cir. 1995).

Once a plaintiff establishes that the debtor operated as a Ponzi scheme, all transfers by the debtor entity are presumptively fraudulent and are subject to avoidance. See Nelson, 2015 WL 4545747, at *2. The recipient of funds from the Ponzi scheme then bears the burden of demonstrating that (1) the funds were received in good faith[2] and (2) in exchange for reasonably equivalent value. See Klein v. King & King & Jones, P.C., No. 2:12-CV-00051, 2013 WL 4498831, at *2 (D. Utah Aug. 19, 2013). "It is well established that an investor in a Ponzi scheme does not exchange reasonably equivalent value for payments which exceed the investor's investments." Miller v. Wulf, 84 F. Supp. 3d 1266, 1274 (D. Utah 2015); see also Donell v. Kowell, 533 F.3d 762, 777 (9th Cir. 2008) (finding that amounts above "the innocent investor's initial outlay . . . are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business," and "[t]hese amounts are not a 'reasonably equivalent' exchange for the defrauded investor's initial outlay"); Scholes v. Ames, 850 F. Supp. 707, 715 (N.D. Ill. 1994) ("A profit is not offset by anything . . . The paying out of profits to

---

[2] The Receiver did not challenge the good faith nature of the transfers to Ms. Oberhansly or the Estate at summary judgment.

[investor] not offset by further investments by him conferred no benefit on the corporations but merely depleted their resources faster."). Accordingly, if the Receiver can establish that the Silver Pool operated as a Ponzi scheme, amounts received by investors in excess of their principal investment—i.e., an investor's "profits" from the scheme—are not received in exchange for reasonably equivalent value and must be returned to the Receivership Estate.

A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments." Jobin v. McKay, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996); accord S.E.C. v. Management Solutions, Inc., No. 2:11-cv-1165-BSJ, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013). "In order to show that an investment scheme falls within the definition of a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors." Management Solutions, 2013 WL 4501088, at *19.[3]

### III. The Silver Pool Operated as a Ponzi Scheme Beginning in at Least 2008.

The undisputed evidence in support of the Receiver's Motion establishes that Receivership Defendants operated the Silver Pool as a Ponzi scheme. Since at least 2008, Receivership Defendants offered a silver investment opportunity in which they solicited investments by representing that investors' funds would be used to trade physical silver, thereby

---

[3] Although an investment opportunity qualifies as a Ponzi scheme if newly invested funds are used to pay existing investors, certain other characteristics are also typically found in Ponzi schemes: promises of substantial, consistent returns; representations that the investment involves little or no risk; payment of substantial returns for at least some time as an enticement to attract new investors; and representations that the investment is secret, exclusive, and/or highly complex. Management Solutions, 2013 WL 4501088, at *19. Ponzi schemes are also, by definition, insolvent from the beginning. Id.; Klein v. Cornelius, 786 F.3d 1310, 1320 (10th Cir. 2015) ("Ponzi schemes are insolvent by definition . . . .").

generating returns for investors. Receivership Defendants represented to investors that one-half of invested funds would be used to purchase physical silver that would be stored in secure locations and that the remaining one-half of the invested funds would be used to buy and sell physical silver on the commodities market. (Receiver's Report at 11–13 & Ex. C at 30–38).

Receivership Defendants claimed to sell physical silver as prices rose and purchase silver when prices fell, thereby increasing the quantity of silver ounces attributable to an investor's "account." (See id.). Through this process of accumulating silver ounces, Receivership Defendants purported to generate significant returns for investors.

Since 2008, Receivership Defendants raised at least $225 million from investors and paid out at least $175 million to investors. (Strong Decl., ¶¶ 92–93). Mr. Rust represented to investors that he managed over $80 million of physical silver on behalf of investors, which was stored in secure facilities in Salt Lake City and Los Angeles. (Receiver's Report at 12 & Ex. D). Unfortunately for investors, Mr. Rust's representations were false.

The Receiver's investigation uncovered no evidence that Receivership Defendants had ever traded physical silver in the manner described to investors. (Id. at 13). Indeed, when questioned by the FBI, Mr. Rust admitted that no significant stores of physical silver existed and that his statements to investors were "all lies."[4] (Receiver's Report, Ex. C at 62:10–15; Ex. F at 25:4–11). The Receiver's investigation also revealed no payments associated with the storage of large quantities of physical silver in secure facilities, which would have constituted an expense of more than $100,000 per year if Mr. Rust's representations had been true. (Id. at 13 & Ex. G). The Receiver also discovered that millions of dollars of investor funds were diverted to other

---

[4] In support of the Motion, the Receiver submitted transcripts of interviews between Mr. Rust and investigators from the FBI and CFTC. In these interviews, Mr. Rust made a number of key admissions.

business entities that were unrelated to any purported silver trading. (Id. at 13). For example, R Legacy Entertainment, LLC ("RLE") operated a variety of entertainment businesses and received more than $22 million from Receivership Defendants, often from funds traceable to investors in the Silver Pool. (Strong Decl. ¶ 104 and related chart). Other affiliated businesses included a horseracing and breeding operation and a company holding certain real property. (Id.). In total, these affiliated businesses received more than $30 million from accounts containing investor funds. (Id.).

It is clear that Receivership Defendants did not trade physical silver in the manner represented to investors. Instead, the evidence presented at summary judgment reveals that Receivership Defendants diverted investor funds to other RRC-affiliated businesses and to pay returns to existing investors.

In interviews with the FBI, Mr. Rust expressly admitted that he had used newly invested funds to pay returns to existing investors in the Silver Pool:

> **SA Malpede:** Were you utilizing new investor money . . . to pay old investors back?
>
> **Rust:** Sometimes . . . .
>
> **SA Malpede:** Okay. Is that not the definition of a Ponzi scheme?
>
> **Rust:** I guess, yes.
>
> . . .
>
> **SA Malpede:** But the reality is that the payments that you're making to these people are truly coming from essentially Ponzi payments. Is that—is that a fair statement?
>
> **Rust:** That is a fair statement, probably.

(Receiver's Report at 15 & Ex. F at 11:8–18; 24:13–18).

In addition to Mr. Rust's admissions, the Receiver's investigation of the books and records of Receivership Defendants revealed no evidence of purchases or sales of silver in

8

amounts that would have been necessary to sustain the Silver Pool and no evidence that Receivership Defendants ever stored the quantities of silver that were represented to investors. (Receiver's Report at 16). Consistent with Mr. Rust's admissions to investigators, Mr. Strong's analysis revealed that payments made to investors could only have been sourced from funds received from other investors and that there was no other source of funds form which these investor payments could have been made.

For example, Mr. Strong's analysis of FY2008 established that the net operating income of Receivership Defendants' businesses was grossly insufficient to fund payments to investors. Of Receivership Defendants' businesses, only RRC was profit-generating. (Strong Decl. ¶¶ 51–54). The highest possible[5] net operating income of RRC for FY2008 was $259,154. (Id.). During that same time period, RRC received at least $3.2 million in payments from investors and made payments to investors in excess of $1.6 million. (Id.). In addition, RRC transferred more than $1.5 million to other RRC-affiliated businesses. (Id.) Combined, RRC funded more than $3.1 million in transfers to investors and other RRC-affiliated businesses in FY2008. It is clear that the only possible source of funds for those transfers was investor payments, meaning that Receivership Defendants were operating a Ponzi scheme since at least 2008.

Mr. Strong conducted a similar analysis for FY2009 and FY2010, which revealed no source of funds that could account for the payments made to investors and other RRC-affiliated business other than investor contributions. (Id.) Mr. Strong's analyses of FY2008–2010

---

[5] Mr. Strong performed three alternative calculations of RRC's profitability for FY2008 to compensate for deficiencies in RRC's records from that time period. In the best-case scenario, as reflected in RRC's tax returns, RRC's total net profit was $259,154. When Mr. Strong accounted for data contained in RRC's QuickBooks activity and point-of-sale data, he concluded that RRC likely suffered a net operating loss of up to ($191,467) for FY2008. Under any scenario, RRC lacked operating income from which to make the identified payments to investors.

persuasively establish the lack of any legitimate profit-generating activity that could account for the millions of dollars paid to investors at least as early as 2008. Mr. Strong's analysis demonstrated that Receivership Defendants continued to raise ever-increasing amounts from investors and to pay exorbitant returns to investors between 2008 and the appointment of the Receiver in 2018. For example, Receivership Defendants paid more than $37 million to investors in the first ten months of 2018 alone. (Id. at Ex. 22.).

Mr. Strong also conducted a detailed analysis of RRC's banking activity and found no possible source of funds that could account for the more than $175 million in disbursements made to investors between 2008 and 2018. As part of his analysis of RRC's banking activity, Mr. Strong highlighted example "snapshots" showing specific instances in which payments to investors could only have been made from money originating from other investors. (Id. ¶¶ 76–90.). For example, a detailed examination of the bank records of RRC between April 13, 2014, and April 17, 2014, reveals that RRC incurred a cash-flow deficiency of more than $22,000 based on its operations. (Id. ¶ 80.) During that same time period, RRC made payments to investors totaling more than $302,000. (Id.) Even assuming that all funds present in RRC's accounts on April 13, 2014, originated from legitimate business activity (which was not established), payments to investors could not have been sourced from legitimate business activity but instead could only have come from newly invested funds.

Similarly, in his investigation, the Receiver discovered internal RRC communications candidly discussing the timing of incoming and outgoing transfers, which revealed that Rust was using newly invested funds to make payments requested by other investors:

**F. Frey:** [Investor 1] check received.

**Rust:** Can we sent [Investor 2's]?

> **F. Frey:** Probably not until Monday . . . Affiliate [account] balance is $29,628.07 + the pending check will not post until later. Also, I have not had the funds to send the $100k+ wire to [Investor 3] so that will happen Monday as well.
>
> **Rust:** Ok. I am assuming [Investor 4] did not pay us for the gold and silver we sold them? Did you hear from [Investor 5] as to when he will be sending his wire? Not sure when I will email you again [sic] will try and do it Monday.
>
> **F. Frey:** Wire was received late Friday . . . [Investor 4] did pay us, it was not enough to carryout [sic] those wires. I will wire to [Investor 2], and [Investor 3] today 3/27/17.

(Receiver's Report at 16–17 & Ex. J.). These communications—combined with Rust's admissions to investigators and Ms. Strong's analysis—leave the Court with the unavoidable conclusion that the Silver Pool exhibited the "*sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors." Management Solutions, 2013 WL 4501088, at *19. For these reasons, the Court concludes that Receivership Defendants operated the Silver Pool as a Ponzi scheme since at least 2008.

### IV.    Fern Oberhansly's Investment in the Silver Pool

The undisputed facts show that Ms. Oberhansly created a Silver Pool account with the Receivership Defendants and invested a total of $2,612,939.68 between 2008 and 2012 prior to her death on February 2, 2017. It is also undisputed that Ms. Oberhansly withdrew $79,500 from her Silver Pool account during her lifetime.

On February 23, 2016, Ms. Oberhansly directed that her Silver Pool account be divided into four equal parts, with each of the resulting accounts held by Ms. Oberhansly and one of her four living children, John Oberhansly, Mark B. Oberhansly, Susan Famulary, and Sally Bastian (the "Oberhansly Family"), as joint tenants with rights of survivorship. After Ms. Oberhansly's death in 2017, Mr. Rust represented to the Oberhansly Family that Ms. Oberhansly's original investment in her Silver Pool account had grown to be worth more than $42 million.

Based on the good faith belief that Ms. Oberhansly's investment in her Silver Pool account had a value of over $42 million, the Estate faced an estate tax liability of approximately $16.4 million with no means in the Estate to satisfy the tax obligation other than the value of the Silver Pool investment account itself. As a result, the Oberhansly Family instructed Mr. Rust to liquidate a portion of their Silver Pool investment to pay the estate taxes. Accordingly, between October 24 and October 31, 2017, the Estate received $16,400,000 from Receivership Defendants, which the Estate then paid to the Internal Revenue Service to satisfy the estate tax liability. In total, Ms. Oberhansly during her lifetime, and later the Estate after her death, received $13,866,560.32 in excess of the amount invested into the Silver Pool.

Utah law is clear that "profits" from a Ponzi scheme that exceed the amount of the initial principal investment must be returned to the Receivership Estate. Miller v. Wulf, 84 F. Supp. 3d 1266, 1274 (D. Utah 2015) ("It is well established that an investor in a Ponzi scheme does not exchange reasonably equivalent value for payments which exceed the investor's investments."). The Estate has indicated it intends to file an amended tax return and seek a refund of excess amounts paid to the IRS based on the good faith belief—created by Receivership Defendants' fraudulent representations—that Ms. Oberhansly's Silver Pool investment was valued at more than $42 million at the time of her death. However, it is undisputed that Ms. Oberhansly and/or the Estate received $13,866,560.32 in fraudulent "profits" from the Silver Pool investment and that the Receiver is entitled to judgment as a matter of law against the Estate in that amount.

## ORDER

For the reasons stated herein, the Receiver's Motion for Partial Summary Judgment (ECF No. 17) is GRANTED. The Court finds and orders as follows:

1. The Silver Pool operated as a Ponzi scheme since at least 2008;

2. During her lifetime Fern Oberhansly invested $2,612,939.68 into the Silver Pool;

3. Ms. Oberhansly, and later her Estate, received $16,479,500 in disbursements from the Silver Pool;

4. The Receiver is entitled to judgment in his favor and against the Estate in the amount of $13,866,560.32.

**SO ORDERED.**

Dated this 22nd day of January, 2021.

BY THE COURT:

*Tena Campbell*
Hon. Tena Campbell
United States District Judge